

1  Keri Curtis Axel (Bar No. 186847)
     kaxel@waymakerlaw.com
2  Emily R. Stierwalt (Bar No. 323927)
3    estierwalt@waymakerlaw.com
   WAYMAKER LLP
4  515 S. Flower Street, Suite 3500
5  Los Angeles, California 90071
   Telephone: (424) 652-7800
6  Facsimile:  (424) 652-7850
7
8  *Attorneys for Defendant Trevor Daniel Jacob*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR-23-221-JFW |
|---|---|
| Plaintiff, | **DEFENDANT TREVOR DANIEL JACOB'S SENTENCING MEMORANDUM** |
| v. | |
| TREVOR DANIEL JACOB, | Crtrm.:  7A |
| Defendant. | Judge:   John F. Walter |

## I. INTRODUCTION

Defendant Trevor Jacob ("Trevor") is an Olympic athlete and an intrepid sportsman. Through athleticism, persistence, discipline, and with a high tolerance for risk and physical pain, Trevor has become a world class snowboarder and all around extreme-sports champion. In snowboarding, from a young age, he competed and won awards in the half-pipe, becoming one of the youngest athletes to qualify for the U.S. Open at 13 years old, and then changed to snowboard cross in his late teens. He has also won multiple competitions in mountain biking. Trevor also is a pilot, skydiver, motocross athlete, skateboarder, and has studied and teaches mountain biking, Jiujitsu and karate. All of these sports are daring, and provide a personal rush and sense of unique achievement, but they can be lonely endeavors as well, where the voice in your head is the only thing that keeps you going.

In November 2021, still in the wake of the Covid lockdown and while living alone in his hanger, the same qualities that have brought Trevor success and fame in these extreme sports led him to a series of bad choices that culminated in the offense to which he has plead guilty. In a lonely place, Trevor carefully planned a new stunt that he regrets. Worse yet, he covered it up and then lied about it to investigators. As the sentencing letters reflect, he sincerely and honestly regrets this conduct, and has given heartful apologies to everyone in his life who has been adversely affected by his crime, and will do so to the Court as well.

A term of imprisonment is not necessary, however, to appropriately address the Section 3553(a) factors. Trevor is a kind person, who amazes those around him with acts of spontaneous generosity. Other than misdemeanors associated with trainhopping, he has no criminal history and, as further discussed below, his criminal history is in fact overstated by counting the same conduct as two offenses, so his guideline range should be 12-18 months in Zone C.

This offense has already been a wake up call, and he has and will continue to suffer collateral consequences from it—from the fact that he is not currently training

1

DEFENDANT JACOB'S SENTENCING POSITION

with the U.S. Olympic team to the fact that he can no longer visit Whistler or Banff in British Columbia, which are major snowboarding attractions and where Trevor has spent substantial time and has close friends. These consequences are punishments that have real bite for him. He is deeply emotional about the fact that he will be banned from Canada.

The defense respectfully submits that, on these unique facts, the Court should order a one-year period of probation. Trevor needs, and will respond well to, a period of supervision by the Probation Office to provide some structure as he re-enters Olympic training and gets his life on track. The sentencing letters from people in his life with authority—from skateboarding mentors to piloting mentors—attest to the fact that he welcomes the support of mentors in his life, and they find him approachable and teachable. Coming from years of disciplined training under the supervision of coaches, that is the life he knows, and he responds well to it. A period of probation with mandatory community service will help him focus on his career, financial sustainability, and follow through on the many community service projects with which he is engaged.

The defense respectfully requests a sentence of one-year of probation with a substantial amount of community service, or, in the alternative, a term of probation with three months' home confinement with community service.

## II.   DISCUSSION

### A.   Sentencing Framework and PSR

The advisory sentencing guidelines are merely "one factor among the [Section] 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). "[T]he history and characteristics of the defendant" are considered alongside "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). "The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for

the law, and provide just punishment; to afford adequate deterrence; [and] to protect the public." *Carty*, 520 F.3d at 991.

The PSR has calculated an advisory guidelines total offense level of 13 with a criminal history category II, resulting in a sentencing range of 15 to 21 months. As demonstrated further below, Trevor's criminal history double-counts the very same offense, so he should in fact be criminal history category I, which results in a sentencing range of 12-18 months, in Zone C. In Zone C, under USSG § 5C1.1(d)(2), the Court may impose a split sentence of half of the term in prison and half in community confinement or home detention. Probation is also available by statute. (PSR ¶ 105.) As explained below, under the § 3553(a) factors, the Court has a strong basis to impose the defense's recommended sentence of probation, which is sufficient but not greater than necessary to address all goals of sentencing.

### B. Trevor Jacob's Personal History and Characteristics

Pursuant to 18 U.S.C. § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court "should consider the nature and circumstances of the offense and *the history and characteristics of the defendant*." (Emphasis added.) The latter considerations are addressed by: (1) a brief overview of Trevor's life; and (2) the words and voices of the many people who have come forward to write the Court letters regarding their knowledge of his many admirable qualities and good deeds.

#### 1. Trevor's Upbringing and Schooling

Trevor grew up in a loving home with a good support system. As Trevor's mother, Lynn Jacob, says, they are "a tight knit family and have always been very close." He and his brother Jordan "have been close to inseparable" all of Trevor's life. Trevor reciprocated the love he received. In the words of his next door neighbor of 20 years, "[h]e values family and friends and loves spending time with them."

At a young age, it was clear that Trevor had a unique talent for snowboarding. (*See* PSR ¶ 60.) At the age of nine, he made it his goal to become a professional snowboarder and Olympic athlete, both of which he eventually achieved. For that reason, Trevor did not have a typical childhood. When his father built a house in Mammoth Lakes, California, Trevor relocated there with him and began to snowboard every day. When he was 12 years old, he began homeschooling with a private teacher so he could focus on snowboarding. (*Id.* at ¶ 62.) At only 16 years old, Trevor made the United States Snowboarding Team. (*Id.* at ¶ 63.) Here are just a few examples of what his peers and family said about his commitment to his craft as a child.

<u>Janice Brown, Trevor's next door neighbor of 20 years</u>: "I saw this boy go to the ski mountain every day to practice skills. This must have taken a lot of discipline and patience."

<u>Lynn Jacob, Trevor's mother</u>: "Trevor set his sights when he was nine years on becoming an [O]lympic athlete. His dedication and hard work to attain his goal came true when he competed in the 2014 Sochi Olympics in BorderCross."

<u>Patrick Bridges, Trevor's childhood friend</u>: "By the time Trevor was 13 he was considered a snowboarding prodigy and made the halfpipe finals of the US Open snowboarding championships . . . . Perhaps what struck me most about Trevor was his ability at a young age to set goals that to most people, including myself seemed unattainable. Yet during this period Trevor still had this rare blend of humility and confidence. Nonetheless if others said something wasn't possible or realistic Trevor would diligently take the initiative to prove the naysayers wrong and often, succeeded and in turn changed perceptions. I respected this about him greatly and found it inspiring."

Also illustrative of his commitment to his craft is that he stayed away from drugs and alcohol, which are commonplace in his industry.

<u>Lynn Jacob</u>: "we are very proud of Trevor as he has never smoked or done drugs and has consistently associated himself with non drinking and non drug using individuals. With that being said he has travelled extensively to sporting events with older kids and still managed to distance himself from the use of drugs and alcohol."

Having snowboarding as an outlet was and is vitally important for Trevor. When he was eight years old, Trevor was diagnosed with ADHD. At times, his ADHD caused Trevor to be impulsive and fail to fully comprehend consequences before acting. Snowboarding allowed him to channel his energy positively.

While he would snowboard whenever he could, he also understood it was a privilege, and showed maturity by remaining prompt, consistent, and inquisitive with his studies. Carrie Cox, Trevor's homeschool tutor for three years in high school said this about Trevor: "I first met Trevor Jacob in the fall of 2008 when I started working as his homeschool tutor his sophomore year of high school . . . . For the next three years[,] until his high school graduation in 2011, Trevor would meet at my home promptly at 8am and we'd begin our lessons in mathematics, English, Spanish, history, and science before he would take to the mountain for his athletic snowboard training for hours in the afternoon during the winter months."

Trevor also took initiative with his education. When he was 15 years old he convinced his parents to let him enroll in high school online and graduated almost two years early. (PSR ¶ 62.)

    2.  *Trevor Is Remorseful and Committed to Personal Growth*

Trevor has deeply contemplated the effects of his actions. Trevor understands the dangerousness and selfishness of his actions, and is genuinely remorseful. The defense submits this case is unique in that Trevor is not only expressing to the Court his feelings of remorse, but he has taken action to go to his family and friends—many of whom have made their disappointment and sadness clear—and verbalized his remorse, and true repentance. It is striking how many times they mention this,

and it is clear they believe that he is humble, forthright and truly accepts responsibility for his conduct.

<u>Gerald Jacob, Trevor's father</u>: "[Trevor] continues to express deep remorse for his actions and is willing to take any necessary steps to make amends."

<u>Aaron Spohn, business owner and community mentor</u>: "During our recent conversation, he exhibited genuine remorse without any attempt to make excuses."

<u>Evan Schoenbrun, Trevor's childhood friend</u>: "I can attest to the sincerity of his expressions of regret and remorse, having engaged in numerous heartfelt conversations with him in person and over the phone regarding this matter."

<u>James Burnett, Trevor's childhood friend</u>: "Trevor has confided in me, sharing the depth of his person growth and maturity that has occurred as a result of this incident.  He has not shied away from the consequences, bearing the weight of public scrutiny and personal reflection."

<u>Janice Brown</u>: "Trevor recently went out of his way to contact me several times.  He wanted to explain to me how sorry he is for his action and has sincere regret and remorse for his bad judgement."

<u>René Minjares, Trevor's friend</u>: "I have spoken with Mr[.] Jacob, at length, in regards to his actions and he has conveyed to me his most sincere remorse over his actions.  I have accepted his apology and I am convinced of his forthrightness."

<u>Colonel Clifton D. Shuman, FAA Designated Flight Examiner</u>: "Trevor has expressed remorse and regret for his actions during my interaction with him."

Trevor has not stopped with apologies, however.  He has expressed his commitment to growing as a person and reemerging as a productive member of society, no matter what his punishment may be.  As his brother Jordan states, "Trevor has mentioned to me numerous times that he is excited to keep moving forward in life, bettering himself, and helping others when this rocky time in his life passes."

### 3. *Trevor Has a Strong, Forthright, and Generous Character*

As his support letters illustrate, what has shocked, confused and disappointed his family and peers the most is that his actions do not align with his character.

To his peers, Trevor is a selfless person. He has life-long friends who say he has been by their side through tough times—he has been described as an "unwavering companion," a "go-to confidant," and a "person who champions those around him." His selflessness does not extend only to those close to him. Instead, when an opportunity arises to be of service, he takes it. As detailed in his support letters, Trevor has helped complete strangers in extreme danger. But these random acts of kindness and service are not because he is simply an "adrenaline junkie." As Joshua Swindell puts it, "I think his real purpose in life is service to others."

Trevor is also a driven person, who made it to the top of his profession at 20 years of age by competing in the 2014 Winter Olympics. (PSR ¶ 63.) Yet he remained humble. As his brother Jordan explained, "[e]ven when others started to see him as snowboarding superstar, he was always the same person." Illustrative of his humility is his consistent efforts to help those around him.

<u>Gerald Jacob</u>: "[O]ver the years, Trevor has dedicated hundreds of hours teaching kids to skateboard at the Malibu Boys and Girls Club."

<u>Josh Swindell, Trevor's close friend</u>: "When we would be at the skatepark he would always be there for the young and old. The same goes for when he'd see somebody crash on a snowboard."

<u>Mark Burnett, friend and mentor</u>: "Trevor was able to achieve impressive athletic success even making it to the Sochi Olympics. However, what was more impressive was Trevor's inclination to encourage those around him to strive for the unthinkable in their own lives."

Despite their disappointment and hurt, his support system has high hopes for his future because of his good character.

<u>Mark Burnett</u>: "Trevor is adamant to put his life back together and I truly believe he has an amazing future ahead of him."

### 4. Trevor Has Concrete Plans for the Future

Vitally important to the analysis of Trevor's punishment is that he has a plan. He understands that, while he temporarily lost his way, he is committed to get back to being the man his family and peers know he is. He is now teaching skydiving, martial arts, surfing, and snowboarding. He has also committed to joining the U.S. Olympic team to train for the upcoming Winter Olympics. He is not guaranteed a spot, and must train with the team beginning this season to win a spot, which he intends to do.

That is not all he wants to do, however. Trevor knows that, as an accomplished athlete, he is a role model to others and has a duty to set a good example. For that reason, another goal of his is to mentor young athletes and do motivational speaking. (PSR ¶ 66.)

Trevor also recognizes that he needs to focus on paying his debt to society. Importantly, his support system recognizes that as well:

<u>Lynn Jacob</u>: "I strongly feel many hours of community service are very appropriate."

<u>Gerald Jacob</u>: "I urge you to sentence my son with a long term of public service whereby he can utilize his talents in helping other kids become better members of our community."

<u>Josh Swindell</u>: "From my vantage point I think society would be better served by Trevor giving back to the community in some sort of service commitment."

The defense therefore requests that the Court include, as a condition of probation, that Trevor do a substantial amount of community service, and recommends 200 hours in a one-year period.

C.  **Objections to Presentence Investigation Report**

1.  *Trevor's Criminal History Is Overstated Because It Double-Counts the Same Offense Conduct*

Under the sentencing guidelines, "the sentencing court may depart downward if the applicable criminal history category 'significantly over-represents the seriousness of a defendant's criminal history.'" *United States v. Brown*, 985 F.2d 477, 481 (9th Cir. 1993) (quoting USSG § 4A1.3 (Policy Statement)). A district court is not bound "to the category into which simple addition places the defendant." *Nichols v. United States*, 511 U.S. 738, 751–52 (1994) (Souter D., concurring). Thus, the guidelines "expressly empower the district court to depart from the range of sentences prescribed for a criminal-history category that inaccurately captures the defendant's actual history of criminal conduct." *Id*. For example, "[a] downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." USSG. § 4A1.3 n.3.

Here, the PSR counts as two different criminal history points the same trespass, because it was erroneously charged in two different counties. (PSR ¶¶ 50, 51.) Specifically, paragraph 50 reflects a misdemeanor charge of "trespassing on railroad train" in Santa Barbara County on July 3, 2017, and paragraph 51 reflects charge of "trespass, railroad property" in Nevada County, California, also on July 3, 2017. In fact, as demonstrated below, this is the same incident, which occurred in or about Goleta, California (not Nevada County at all). The fact that the conduct was charged in two counties, however, doubles Trevor's criminal history score from I to II and unfairly over-represents Trevor's criminal history, because it is only one event charged twice.

In fact, the incident occurred on June 9, 2017, when Trevor boarded a Union Pacific freight train and rode it along the coast in the area of Goleta, California.

Later, on or about July 3, 2017, he posted a video of his trainhopping to YouTube, hence the date of the charge. But Trevor has pulled the footage of the event from a hard drive, which the defense has made available to the prosecutor, and a Southern California beach is clearly present in the picture. The defense provides to this Court a copy of the metadata from that video demonstrating it was taken in or about Goleta on June 9, 2017, as well as two screenshots. (*See* Axel Decl. Exs. 1, 2.) The defense also provides a map of the freight routes in California, which shows the stretch along the beach in Ventura County. (*Id.* at Ex. 3.) Wikipedia provides that freight trains in California are typically "local freight." (*See* Ex. 4.)

Trevor's bank records also evidence that he was in Southern California on June 9, 2017, and not in California at all on July 3, 2017. Attached to the Axel Declaration is a credit card record from Trevor that shows that, on June 9, 2017, he bought breakfast in Malibu and gas in Santa Barbara. (Axel Decl. Ex. 5.) Then, on July 3, 2017, he was visiting friends in Maryland. (Axel Decl. Ex. 6-7.) In short, he was not in Nevada County on June 9, 2017 or July 3, 2017, and did not ride a train there.

The defense has also obtained the conviction records for both offenses, and spoken to one of the Assistant District Attorneys who prosecuted Trevor.

Nevada County was the first to charge Trevor, based on video of the incident, on July 28, 2017. (Axel Decl., Ex. 8.) Trevor appeared in Nevada County unrepresented on August 21, 2017, pled guilty to a single misdemeanor, and was given three years' probation. (*See id.*) It is unclear why Nevada County thought they had venue.[1] The undersigned spoke with ADA Anna Tyner, who said she did not handle the initial appearance and plea proceeding, but she knew that she sought

---

[1] It is only speculation, but perhaps Nevada County thought they had venue because they had a prior train trespass case with Trevor when, as a teen, he had jumped over a train with a skateboard (*see* PSR 49).

10
DEFENDANT JACOB'S SENTENCING POSITION

a modification to require Trevor to delete the videos posted online of train hopping on YouTube. He complied with this condition and the defense has been unable to locate the video anywhere online. She also helpfully advised that the investigator notes in her file stated that the train was in Goleta, and was a Northbound LOF 67.[2] (Axel Decl., ¶ 10).

The Santa Barbara DA then charged the same conduct on September 29, 2017. (Axel Decl., Ex. 9). Again acting in pro per, Trevor appeared and pled guilty to a single misdemeanor, and received three years' probation. (*Id.*) He successfully completed both probationary terms.

Based on these facts, the defense respectfully asks the Court to find that Trevor's criminal history is overstated. This should have been one misdemeanor offense instead of two offenses, as Trevor was simply erroneously charged in Nevada County for conduct that happened in Santa Barbara County. Without the double-counting of this single offense, Trevor would be in criminal history category I. The defense respectfully requests that the Court find that the calculation over-represents Trevor's criminal history, and requests that this Court (and the Probation Office) adjust his criminal history score to Category I.

          2.     *Personal Loans Should Not Be Discounted*

In its Assessment of Financial Condition, the Probation Office concludes that Trevor's monthly cash flow is $441 (PSR ¶ 94). But it reaches this figure by discounting two personal loans that he owes friends Travis Pastrana and Matt Miller (*Id.*). Including these loans, the Probation Office concludes that Trevor outspends his income every month by approximately $5,000. The defense objects to the deletion of these loans from the calculation of Trevor's monthly cash flow.

---

[2] Ms. Tyner also volunteered that this misdemeanor conviction is subject to dismissal under California law, and that she would not oppose the dismissal. She says that, in Nevada County, it would be calendared for hearing the judge there would promptly dismiss it. (*See* Axel Decl. ¶ 11).

The two-referenced personal loans are real obligations that should be included in the calculation of his monthly cash flow. One of these personal loans is for $100,000 with a 7% interest for the plane and, if not repaid by June 30, 2025, then the Lender is entitled to collect the RANS S21 aircraft. This loan, and Miller loan, function the same as Trevor's car and auto loans from financial institutions. Personal loans and financial institution loans should be treated the same. Thus, Trevor requests that only the first sentence of paragraph 94 be considered and that the last two sentences are deleted. Similarly, Trevor requests that the last sentence of paragraph 97 be deleted and that paragraph 99 be deleted in its entirety because Trevor's ability to pay $440 per month exists only when personal loans are discounted.

        3.     *No Evidence That Trevor Has an Ability to Pay Either an Immediate Payment of $57,000 or $440 Per Month*

The defense also objects to the PSR's conclusion that Trevor has an ability to pay $57,000 or $440 per month. (*See* PSR ¶ 98-99). The Probation Office concludes that Trevor has a net worth of only $18,729, yet concludes that Trevor has the ability to pay an immediate payment of $57,000 in paragraph 98 of the report. These conclusions are irreconcilable. Trevor requests that $57,000 is replaced with $18,729 in paragraphs 97 and 98.

It is unclear to the defense how the probation office concluded that Trevor's current liquid assets totaled $57,000 at the time of the PSR, given that his assets net of liabilities equaled only $18,729. (PSR ¶ 98-99.) The figure is even lower now. The defense has attached as Exhibit 10 to the Axel Declaration a true and correct copy of a recent bank statement, which shows that, as of the end of October, Trevor had only about $23,000 in the bank, not the approximate $57,000 at the time the PSR was prepared (and he has checks outstanding that will eat up much of this balance by the time of sentencing). (*See* Axel Decl., Ex. 10). He certainly cannot

make an immediate payment of $57,000, as he has almost no remaining assets other than the vehicles, which are encumbered.

There is also no evidence that Trevor can pay $440 per month. As noted in the previous section, the $440 per month figure was only derived after excluding from the calculation personal loans that secure assets. Once that figure is adjusted to reflect the Probation Office's alternative conclusion that that Trevor outspends his monthly income every month (PSR ¶ 94), it should be clear that Trevor does not have the ability to pay a fine.

Further evidence is found in his historical tax returns which, year over year, show negative income. (PSR ¶ 95).

For these reasons, the defense requests that the Court find that Trevor does not have the ability to pay a fine, and waive the fine. Alternatively, the defense requests a low end fine of $5,500 (*see* PSR ¶ 109), to be paid on an installment schedule during the period of supervised release. *See* USSG ¶ 5E1.2 (f).

### D.     The Remaining 18 U.S.C. § 3553(a) Factors Support a Non-Custodial Sentence

In arriving at a sentence, that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court needs to consider a number of other factors, including: (1) the nature and circumstances of the offense; and (2) the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). The following is a discussion of how those factors, the most relevant ones here other than Trevor's personal history and characteristics discussed above, support the defense's requested sentence.

### 1. The Nature and Circumstances of the Offenses

The offense to which Trevor has pled guilty is obstruction of justice, in violation of 18 U.S.C. § 1519, for his conduct in destroying the wrecking of his plane and deceiving the investigators about it. He has already received a two-level enhancement for selecting an "essential or especially probative" tangible object to alter. The guidelines themselves therefore already consider the aggravating factors concerning the nature and circumstances of the offense. The defense requests that the Court also consider mitigating circumstances surrounding the offense, such as the fact that the conduct was aberrational for defendant and occurred during a dark, lonely period, and that he has subsequently earned the respect of even those in the flying community, which is no mean feat. If those with whom he flies trust him to be responsible and legally compliant in the future, it further illustrates that the circumstances were unique and will not be repeated.

### 2. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A probationary sentence, or a sentence of probation with three months' home confinement, would be sufficient to reflect the seriousness of the offense and to promote respect for the law. As Trevor's sentencing letters reflect, he does respect the law, and his conduct was very much an aberration. A former military officer, as well as Trevor's flight instructor, sent letters attesting to his respect for their authority, his maturity and responsibility as an airman, and his sincere remorse. In addition, the defense has attached an email from one of the FAA investigators, Kyle Lomazow, who indicated that he could not send a letter in support, but sent his cordial respect to Trevor nevertheless and wished him the best through this process.

As these letters show, Trevor does not need a sentence of imprisonment to take the offense seriously, or to instill in him respect for the law. He has such respect, and has demonstrated it even to those with whom he has flown. In the case of the FAA, after a one-year period in which the FAA required him to forfeit his

license (Axel Decl., Ex. 11), the inspector then cooperated in Trevor's reapplication process, and Trevor earned back his wings and has been flying again since June 2023. (Axel Decl., Ex. 12; *see also* Clifton Shuman letter).

A probationary sentence is also sufficient to provide just punishment for the offense. A term of probation is a serious sentence, and it would provide Trevor with structure, but it would also impede the freedom that he would usually have in planning his affairs and in traveling. As noted in the introduction and in his mother's letter, the fact that Trevor is delayed in his Olympic training, and cannot ever again visit Canada, are also unique additional punishments here. The fact that Trevor cannot go to British Columbia is a real punishment to a professional snowboarder, and would not affect other people the way that restriction uniquely affects Trevor. In sum, a probationary sentence is sufficient to provide just punishment and to install a respect for the law.

       3.    *Adequate Deterrence to Criminal Conduct/Protection of the Public*

Similarly, a probationary sentence is sufficient to deter any further criminal conduct. Based on his minimal criminal history and personal characteristics, Trevor poses a very low risk of recidivism. More importantly, as the letters of support attest, he has learned his lesson, taking responsibility and expressing remorse personally to all of his risk and family. Trevor has experienced a humbling amount of shame from this conduct, and does not wish to repeat that feeling. As such, Trevor presents no risk of reoffending, and any form of custody is wholly unnecessary to protect the public.

/ / /

/ / /

/ / /

### III. CONCLUSION

Trevor knows his crimes represent a tremendous failure on his part. But he has accepted responsibility for his conduct (doing so pre-indictment), and is sincerely remorseful for what he has done. Trevor is dedicated to being a productive and law-abiding citizen when this is behind him. Trevor has so much to offer the world, and he wishes to and can be a valuable and contributing member to society—most importantly, to children hopes to mentor. A probationary sentence with community service for Trevor would be sufficient but not greater than necessary to achieve all goals of federal sentencing.

DATED: November 13, 2023         WAYMAKER LLP

By:  /s/ Keri Curtis Axel
KERI CURTIS AXEL
*Attorneys for Defendant Trevor Daniel Jacob*