UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,       )
                                )
          PLAINTIFF,            )      CASE NO.
                                )
          vs.                   )      CR 23-221-JFW
                                )
TREVOR DANIEL JACOB,            )
                                )      PAGES 1 TO 29
          DEFENDANT.            )
_____)


REPORTER'S TRANSCRIPT OF
SENTENCING
MONDAY, DECEMBER 4, 2023
9:24 A.M.
LOS ANGELES, CALIFORNIA


_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

      BILAL ESSAYLI
      UNITED STATES ATTORNEY
      BY:  DOMINIQUE M. CAAMANO
      BY:  DENNIS MITCHELL
      Assistant United States Attorney
      United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012


**FOR THE DEFENDANT:**

      WAYMAKER LLP
      BY:  KERI CURTIS AXEL
      515 South Flower Street
      Suite 3500
      Los Angeles, California 90071

**LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 4, 2023**

**9:24 A.M.**

**---**

THE CLERK:  Calling item 3, CR 23-221-JFW, United States of America versus Trevor Daniel Jacob.

Counsel, please state your appearances.

MS. CAAMANO:  Good morning, Your Honor. Dominique Caamano for the Government --

THE COURT:  Are the microphones on, Shannon?

THE CLERK:  They are.

THE COURT:  The microphones are now on, so why don't you restate your appearance.

MS. CAAMANO:  Thank you, Your Honor.

Good morning, Your Honor.  AUSA Dominique Caamano on behalf of the United States.  Here with me at counsel table is AUSA Dennis Mitchell.

MS. AXEL:  Good morning, Your Honor. Keri Curtis Axel on behalf of the defendant Trevor Jacob who is present and on bond.

THE COURT:  All right.  This matter is before the Court for pronouncement of judgment and imposition of sentence. Is there any reason why judgment and sentence should not be imposed at this time?

MS. CAAMANO:  No, Your Honor.

MS. AXEL:  No, Your Honor.

THE COURT:  All right.  Was the -- have you and your client had an opportunity to read and discuss the presentence report as well as the recommendation letter that was filed on October 3rd?

MS. AXEL:  Yes, Your Honor.

THE COURT:  All right.  Although the United States Sentencing Guidelines are now advisory, the Court must still consider the advisory guideline range in addition to the other directives set forth in Section 3553(a) and impose a sentence that is sufficient but not greater than necessary to comply with the purposes of the act.

As counsel know, this Court follows a two-step or a two-phase sentencing process.  In phase one, the Court will determine or calculate the applicable advisory guideline range which will require the Court to resolve any objections to the presentence report guideline calculations as well as any factual disputes.  Thereafter, I will determine whether, pursuant to the Sentencing Commission Policy Statements, any departures from the advisory guideline range clearly apply.

In this case, in June of this year, the defendant entered a plea of guilty to a single-count Information.  The plea was entered pursuant to a plea agreement that appears as Docket No. 6.  On October 3rd, the probation officer filed a presentence report and a letter of recommendation.  Those

appear as docket Nos. 20 and 21.  On November 27th, the probation officer filed an addendum to the presentence report which appears as Docket No. 30.

The probation officer has made the following advisory guideline calculations that are consistent with paragraph 11 of the plea agreement.  The probation officer has concluded that the base offense level for this offense is level 14 as set forth in paragraph 37 of the presentence report.  To that the probation officer has added a two-level increase as set forth in paragraph 38.  The probation officer has concluded that the adjusted offense level is 16, and the probation officer has reduced the adjusted offense level of 16 by three levels for the defendant's acceptance of responsibility.  The total offense level as calculated by the probation officer is level 13.  The probation officer concluded that the defendant's criminal history category is category II. The advisory resulting guideline range as calculated by the probation officer is 15 to 21 months.

The Government filed its sentencing position paper on November 13th.  It appears as Docket No. 27.  And on November 20th in Docket No. 29, the Government filed an addendum.  The defense filed the sentencing -- on November 13th the defendant filed his sentencing position papers which appear as docket Nos. 25 and 26.  The defendant on November 27th filed three supplemental letters of support and on December 1st filed

an additional letter of support.  It appears as Docket No. 33.

Based upon my review of the respective filings in this case, there are several phase one issues to be resolved. The first issue relates to the defendant's criminal history category.  The Government agrees, based upon the information provided by the defendant, that the defendant's criminal history category should be category I and not category II as calculated or determined by the probation officer.  I agree, and I conclude that the defendant's criminal history category should be category I.

The second issue -- which results in a total offense level of -- with a total offense level of 13 and a criminal history category of I results in a range of 12 to 18 months.

Second, the Government in its addendum recommended an additional condition of supervised release, and that related to the defendant's being able to fly his plane or any other plane to which he is licensed to.  The Government argues that given the nature and seriousness of the offense, that he should not be allowed to pilot any aircraft during the term of supervised release.

The probation officer in the addendum responded to the Government's request, and I agree with the probation officer, and I conclude that the -- that the FAA is better suited to determine punishment regarding -- that Mr. Jacob

should receive.  Apparently his license was suspended and then subsequently reinstated.  So to me that's a matter between Mr. Jacob and the FAA.

And the third issue is the issue with respect to the fine, and I agree with the defendant that if you include the two loans that -- I didn't quite understand what the probation officer had done.  But if you include those two loans, that the defendant does not have the ability to pay a fine, and I don't intend to impose a fine.

So those are my rulings on the issues raised in phase one.  Are there any other phase one issues that the Court must rule on?

MS. AXEL:  Not from the defense, Your Honor.

THE COURT:  Mr. Mitchell, do you want to say something?

MR. MITCHELL:  We're just conferring for a moment, Your Honor.

MS. CAAMANO:  Your Honor, with apologies, we were just conferring.

With respect to the FAA as a matter of argument, we understand the probation's position that the FAA is better suited on a regulatory matter.  However, as we understand from the statutory scheme, the FAA is only allowed to withdraw a pilot's license for very specific crimes, particularly, as we understand, drug-based offenses.  So in this case, to us --

THE COURT:  Let me interrupt you.

This was a late request by Mr. Mitchell in his addendum, and there was really no analysis of what you are about to argue.  So I find it should have been included -- that argument should have been included in the initial papers, and I'm not going to entertain -- you can argue whatever you want, but I'm not going to change my mind with respect to the ruling that I made.

MS. CAAMANO:  Understand, Your Honor.  Thank you.

THE COURT:  All right.  Then that will conclude phase one.

After calculating the advisory guideline range in phase two, I must consider and take into account the Congressional goals of sentencing as set forth in the Sentencing Reform Act and impose a sentence that is sufficient but not greater than necessary to reflect the principles stated in 3553(a) and accomplish the goals or needs of sentencing as set forth in 3553(a)(2).

The recommendations with respect to the appropriate sentence, the probation officer has recommended a 15-month sentence that -- although I don't think the probation officer took a different position in the addendum.  In any event, that's the probation officer's recommendation.

The Government had varying recommendations in the original sentencing position papers from 10 months to 12 months

to 15 months, and I think where the Government ended up in the most recent addendum to its sentencing position paper was a recommendation of 12 months, three years of supervised release.

Mr. Mitchell, you can advise me if I'm accurate or not.

MR. MITCHELL:  That's correct, Your Honor.  It was a 12-month recommendation.

THE COURT:  Okay.  Does the Government have anything it wishes to add to its papers?

MS. CAAMANO:  Yes, Your Honor.  Just with respect to the papers and to add, this is a serious offense where we recommend the low end guideline.  This is not a barren -- as defense has argued, this is barren conduct, and from the Government's perspective, this is not barren conduct.  This is not the sole occasion where, if you will, Mr. Jacob has created a daredevil antic that went against the law.  In this particular instance, he was caught, and there are consequences to pay when you do things that could put people in harm's way.

There could have been serious consequences to the conduct here.  Not only was there a plane crash here, there was also planning involved with this crash with videocameras being mounted onto the airplane and a selfie stick being added so there could be additional footage recovered.  And then once the FAA and other federal regulators were involved, Mr. Jacob did not disclose the location of the aircraft and, in fact, lied

about its location when he had already destroyed the aircraft.

So in this instance, we recommend, as we talked and as we argued in our papers, the low end guidelines for a custodial period.

THE COURT:  All right.  I will hear from counsel and the defendant if he wishes to address the Court.

MS. AXEL:  Yes, Your Honor.  May we take the podium?

THE COURT:  Yes.

MS. AXEL:  Your Honor, I will speak first if that's okay with the Court.

THE COURT:  Yes.

MS. AXEL:  You know, Your Honor, I'm pleased to represent Mr. Jacob who is really one of the most humble people that I have met.  His heart is very open.  He wears it on his sleeve.  I think that came in loud and clear through his letters.

His heart is also very courageous, Your Honor. He is a person who would take risks that you and I could not even think about taking.  Again, I think the letters are helpful in that because you see people who understand Mr. Jacob and his world and yet see in him someone who has not gotten into this situation before.

THE COURT:  It's hard to reconcile his law-abiding and successful life with the incredibly poor

decisions that he made, not only to crash his plane but also to lie about it to the FAA and obstruct them in their investigation.

His letter was particularly insightful in terms of his conduct. He just didn't make one decision. He made a series of decisions. As he indicated in his letter when he was standing at the crash site covered in poison oak, apparently that didn't persuade him that he shouldn't go down the path of the subsequent dumb decisions which is what makes this the serious nature of the crime, not only the crash of the plane but also obstructing the investigation of the NTSB and the FAA into the crash of the plane and hiring a helicopter company to go and get the wreckage, bring it back to the airport, cut up the pieces to make sure no one saw it. So this is -- this is a very serious offense.

MS. AXEL: I understand that, Your Honor. He understands that, Your Honor, as well. We're really here not about the stunt really so much as the obstruction conduct that happened afterwards. That's really the nature of the offense that we're talking about, not really the risk of the plane itself.

Your Honor, I would not generally advise a client to quite put in so much of his life and thinking, but I did think the Court would have those questions, and I thought that, you know, allowing Mr. Jacob to answer them the best way he

could to try to put himself in the mindset at the time.  And all he can say is he was really in a spiral of loneliness.

Your Honor, when I first met him, I think he had really already -- he recognized in his heart that that had been the wrong course of conduct.  And from the moment I met him, I told him, you know, this is a serious crime.  This is a serious offense.  He had been represented sort of informally by a family friend who said you're never going to get charged. Nothing is going to happen.  And, you know, every defense lawyer will tell you that they have had a client walk in the door and they have said, yeah, you are going to get charged, this is going to happen.  And they go to find somebody else. That is not what Trevor did.  Trevor came back and said, I want you to represent me.

I knew from that moment he got it.  He may have made bad decisions and a series of bad decisions at that point, Your Honor, and then continued to get bad advice about what to do with the investigation.  But from that point forward, he has taken responsibility, and he gets it.  To his friends, to his family.  I have never seen anybody who has gone to everybody they know and tried to say I want to make this right with you.

So he was just in a really dark place, a lonely place where it was him and his hangar and his plane at that point, and he made a bad decision.

The Government focuses on the nature of the

conduct, Your Honor, but again, this is really about the obstruction conduct, not about the plane itself. I do think it was aberrational. The Government has tried to say he's had a series of these things, but the two offenses that the Court has found are basically the same, jumping on a train, train hopping. That's not the kind of thing, that was not causing risk to other people in the same way this one is, and he recognizes that.

I would also say, Your Honor, he's a unique person with a unique life as the Court knows. He has -- you know, there isn't a need for general deterrence here. Nobody is going to be jumping out of airplanes and destroying things. The Court is very experienced. I'm sure you have never seen a case like this. This is really kind of a one-off situation.

Also, with respect to specific deterrence, he does not need to be specifically deterred. He has been deterred. He is so afraid of what happens next from here forward. He's stuck with legal expenses. He lost his girlfriend. He's had to sit out from snowboarding and training.

And I know we mentioned the Canada thing, and Your Honor may think that's a strange thing for us to mention. But one of the very first things he asked me was, is it true that if I take the plea agreement, I plead guilty to a felony, I can never go to Whistler? And I didn't know that.

Your Honor, I have been in this business -- as you know, I have been in criminal for 20 years. I did not know that. I had to go look it up. I have never had a defendant focus on it. It was one of the very first things.

So his life has been altered in ways that are measurable and, you know, extremely painful to him. He doesn't need prison. He's a very sensitive person. He doesn't need, you know, an education. There are no drug and alcohol issues. That's very unique for somebody in his field, and it does show a lot of self determination and strength.

As for rehabilitation, we think he will get more support from the probation officer, somebody who, you know, is going to ask for financial reports, is going to monitor him while he gets back on his feet. This is just not a situation where jail is necessary. We think it could really backfire. As the Court knows, some people never can put their lives back together once they go to jail.

So we are begging for a term of probation. I think, you know, unless the Court has any questions for me, I will let Mr. Jacob speak.

THE COURT:  All right.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  I appreciate your time.

Dear Judge Walter, the Government attorneys,

Probation Officer Rotter, my lawyer, my family and friends, I apologize from the bottom of my heart that we are gathered here today for my sentencing.  My actions two years ago due to my errors in judgment, my ego, have led me to this embarrassing moment in my life.  I look back in complete shame of my conduct.  I am extremely disappointed in myself, and I feel extreme remorse and guilt knowing the resources and precious time and energy I have used with this embarrassing action.

I promise to you, Judge Walter, and to God that nothing like this will ever happen again, and you will never see me in front of you ever again.

I have deeply learned from this in more ways than I can count.  This has been the biggest mistake of my life.  It has ruined my relationships, my career, my reputation, my quality of life, and my happiness.

I want the Court to truly know that I believe from the bottom of my heart I would break as a person if you send me to prison.  I have an open heart, and I'm very sensitive.  I would be crushed, and if I go to prison, I believe it will kill all my dreams and crush me to a point of no return.

I have endured so much pain from this situation, and I feel at a certain point I will become a lost hope to myself.  I'm so scared, and I have learned my lesson.  I don't need to go away to prison to be scared straight.  I am so

scared already.  I promise to be scared straight for the rest of my life.  This situation has brought me back to firm reality.  I am shaken to my core.

Your Honor, I pray that you will give me a second chance at redeeming myself with getting back on the Olympic team this winter.  I have dedicated my life to being the best snowboarder in the world, and I am not finished.  I got sidetracked a few years ago and was pulled in some unfortunate directions, but I take great pride in representing our wonderful country.

Without sounding egotistical, I am a national champion and a world champion on my snowboard.  Although I was inches from bringing home a gold medal from the United States previously, I know I can still do that.  I plan to do that.  I need to get back up on the mountain immediately.  I have matured and learned from my previous experiences to truly become the best version of myself.

I am also committed to uplifting society through inspiring young people to follow their athletic passions, conserving nature, and appreciating the beautiful planet we live on through outdoors.  I will dedicate a large amount of my life to teaching children the dangers of external pressures including influences from businesses, social media, and peers.

From the bottom of my heart, I cannot tell you truly how sorry I am and so very ashamed I am.  I never want to

feel the pain I felt and caused for those around me with this situation ever again.

I hold myself to a very high moral standard, and I'm very hard on myself. I have beaten myself up so terribly over this situation to the point where I wonder if I can ever forgive myself. I cry myself to sleep. I have learned from my mistakes to say the least. I can only convey so much through these words. But I promise to you, Judge Walter, my actions over the coming decades will prove my words here correct.

I am deeply, deeply sorry for what I did and for wasting all of your time and resources with my stupidity. Please have mercy on me, and please permit me time on probation to prove I have changed. I promise to you and to God nothing like this will ever happen again.

Thank you so much for your time, Your Honor. Trevor.

THE COURT: All right. Is there any legal reason why sentence should not be pronounced?

MS. CAAMANO: No, Your Honor.

MS. AXEL: No, Your Honor.

THE COURT: All right. After -- in fashioning the sentence to be imposed in this case, I have made an individualized assessment based upon the facts and arguments presented by the parties, and I have considered and applied all of the 3553(a) factors. However, I want to discuss several of

those factors.

The first is the nature and circumstances of the offense.  That's captured by the factual basis for the defendant's plea of guilty in paragraph 9 of the plea agreement and the offense conduct section of the PSR which I incorporate as part of my analysis of this factor.

On November 21st of 2021, the defendant, an experienced pilot and skydiver, took off in his airplane from Lompoc City Airport on a solo flight purportedly destined for Mammoth Lakes.  However, defendant did not intend to reach that destination.  Instead, pursuant to a scheme to gain notoriety and to make money, defendant planned to eject from his airplane during the flight and video himself parachuting to the ground and video his airplane as it crashed.

Prior to taking off, the defendant mounted several videocameras on different parts of the airplane and equipped himself with a parachute, videocamera, and a selfie stick.  Approximately 35 minutes after taking off, while flying above the Las Padres National Forest near Santa Maria, California, defendant ejected from the airplane and videoed himself as he parachuted to the ground.  Using the videocamera mounted on a selfie stick and the video cameras mounted on the airplane, defendant was able to record the airplane as it crashed into the dry brush area.

After parachuting to the ground, the defendant

hiked to the location of the wreck and recovered the data containing the video recording of the defendant's flight and the crash of the airplane.

On November 26th of 2021, the defendant informed the National Transportation Safety Board about the crash. The NTSB launched an investigation, and a senior accident investigator interviewed the defendant by telephone. During that interview, the investigator specifically advised the defendant that he was responsible for preserving the wreckage and that the NTSB would need to examine the wreckage.

At the conclusion of that interview, defendant agreed that he would determine the location of the crash and provide it to the investigator. Defendant also agreed to provide the investigator with videos of the accident.

A few days later, November 29th, the Federal Aviation Administration also launched an investigation into the crash of the defendant's airplane.

On or about November 30th, the investigator from the NTSB asked the defendant by e-mail if the defendant knew the longitude and latitude coordinates for the wreckage of his aircraft. The defendant responded by e-mail and lied and stated that he did not have the coordinates and he was still trying to figure out exactly where the wreck was located.

On January 3rd of 2022, that investigator again e-mailed the defendant and, among other things, asked *Has the*

*wreckage been recovered?* and posed the question, *If so, where is it?*  The defendant again responded by e-mail and again lied and falsely stated, *I'm not aware of the location of the plane.*

Despite defendant's claim that he was not aware of the location of the wreckage, defendant had, in fact, previously found the wreckage, had removed it from the crash site.  Specifically, in early December, the defendant contacted a helicopter company and arranged to have the wreckage taken to the Lompoc airport where the defendant cut up and destroyed the airplane wreckage, deposited parts of the wrecked airplane in the trash receptacles at the airport, all in an effort to impede and obstruct the FAA and/or NTSB from being able to inspect the wreckage as part of their investigation.

As the Government points out, what is particularly troubling about the defendant's conduct was that financial gain was at least partially a motive for the defendant in committing these offenses.  Prior to defendant's flight, he had secured a sponsorship from a company that sold various products including a wallet.  Pursuant to that sponsorship deal, the defendant would promote the company's wallet in the video to be posted by the defendant on YouTube.

Defendant intended to make money by promoting the wallet and the video that would depict, among other things, defendant parachuting from his airplane and the plane descending and crashing.  As a result, the defendant uploaded a

video on YouTube that contained a promotion of the wallet and a video of, among other things, defendant piloting the aircraft, ejecting from the airplane, and parachuting to the ground and the defendant's plane crashing into the forest.

In my view, this is a very serious offense which does require a prison sentence and not a probationary sentence as suggested by the defendant.

As to the nature -- the history and characteristics of the defendant, that's captured by the defendant's sentencing papers and the very informative letters in support of the defendant and the presentence report which I incorporate as part of my analysis of this factor.

As to the defendant's upbringing, the defendant grew up in a loving home with a good support system, and as his mother states in her letter, they are a tight-knit family and have always been very close.

At a young age it was clear that the defendant had a unique talent for snowboarding. At age 9 he made it his goal to become a professional snowboarder and Olympic athlete. As he stated in his letter, from age 11 he was set on a path designed by coaches, managers, and sponsors to become the best snowboarder in the world and earn Olympic medals. By the time he was 20, defendant was officially an Olympian who had qualified as No. 1 American for the U.S. for the 2014 U.S. team and was already a national champion and World Cup champion.

On the day of the Olympic race, the defendant in his letter indicates that he broke his ankle but pushed through the pain and continued to compete.  He made the semi-final but missed the final round of six competitors by only an inch which the defendant believed would have led him to a gold medal.

In his letter, the defendant states that his entire life crumbled at that point in time.  He was hurt, lost, sad, depressed, and suddenly without structure, went from training every day to achieve his goal to feeling that he had zero purpose in his life.

Following the Olympics, as he stated in his letter, he needed reconstructive ankle surgeries and could not engage in athletics for over two years.  He also states in his letter that he experienced an identity crisis trying to rebuild his life and began working as a freelance action sports athlete doing commercials for companies such as Google, Nike, and Ford.

As the letters of support indicate, what has shocked, confused and disappointed his family and friends the most is that his actions are inconsistent with his character. As the many letters submitted universally note, defendant is a selfless person.  He's kind and caring.  He has lifelong friends who say he has been by their side through tough times. He's been described as an unwavering companion, a go-to confidante, and a person who champions those around him.  His selflessness does not extend to any of those close to him.

Instead, when opportunity arises to be of service, he takes it on.  As detailed in the support letters, he's helped complete strangers in their time of need and danger.

Defendant understands that although he temporarily lost his way, he is committed to return to being the man his family and friends know he is.  He's now teaching skydiving, martial arts, surfing, and snowboarding, and he's committed to joining the U.S. Olympic team to train for the upcoming winter Olympics.

In summary, it appears based upon this extensive record, that the defendant is generally a good guy who has lived a law-abiding life who made several incredibly foolish mistakes.  The question for the Court is what punishment is appropriate which makes this a very difficult case.

As counsel noted, the defendant has no mental or emotional issues.  He has no issues with substance abuse.  Notwithstanding that the use of drugs and alcohol are apparently commonplace in his sport, he was able to stay away from drugs and alcohol and never had substance abuse issues.

As I indicated, the defendant has the love and support of his family and friends as seen from the many letters, and I was particularly impressed with the letter from his father who states that Trevor is a talented, bright, and kindhearted young man who made a huge mistake that he sincerely regrets.  The letter goes on to state, "My son Trevor has never

denied his responsibility for the criminal offense which he has committed.  He continues to express deep remorse for his actions and is willing to take any necessary steps to make amends."

The defendant has accepted responsibility by entering a plea of guilty which I consider to be a very important sentencing factor.

The defendant has expressed remorse in his letter to the Court and this morning which I find is sincere.  This factor, in my view, favors a certain degree of leniency.

The next factor that I considered is unwarranted sentencing disparity.  The Court concludes that to the extent any disparity exists, it is not unwarranted and is fully justified by the unique circumstances of this case which include the presence of aggravating factors.

Restitution is not applicable in this case.

Finally, in fashioning the sentence in this case, I have also considered the goals or purposes of sentencing, and I conclude that the Court's sentence is sufficient but not greater than necessary to meet the four purposes of sentencing as set forth in 3553(a)(2).

The Court has already concluded that this is a serious offense and requires a sentence that will promote respect for the law and provide just punishment.

A related and justifiable reason for punishment

in this case is the legitimate concern that anything but a prison sentence would rightly be regarded as deprecating the seriousness of this crime.

So for all of the foregoing reasons, the Court imposes the following sentence:

It is ordered that the defendant shall pay to the United States a special assessment of $100 which is due immediately.  Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.

Pursuant to Guideline Section 5E1.2(a), all fines are waived as the Court finds the defendant has established that he is unable to pay and is not likely to become able to pay any fine.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed on Count 1 of the Information to the custody of the Bureau of Prisons for a term of six months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of two years under the following terms and conditions:

One, the defendant shall comply with the rules and regulations of the U.S. Probation and Pretrial Services Office and second amended General Order 20-04;

Two, during the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment;

Three, the defendant shall cooperate in the collection of a DNA sample from the defendant.

The drug testing condition mandated by statute is suspended based upon the Court's determination that the defendant poses a low risk of future substance abuse.

I want to advise the defendant that under your plea agreement with the Government you might have waived most of your right to appeal this sentence and your plea agreement will govern this issue.  However, if you retain the right to appeal and you wish to appeal this sentence, you must file a Notice of Appeal within 14 days of today or you will lose your right to an appeal.  If you're unable to afford an attorney for your appeal, one may be appointed at no cost to you.

I'm going to allow the defendant to surrender to the Bureau of Prisons.  Do you have a date in January in mind?

MS. AXEL:  Yes, Your Honor.  If he can have until the end of January.

THE COURT:  All right.  It is further ordered that the defendant shall surrender for the service of his sentence at the institution designated by the Bureau of Prisons on or before noon on January 29th of 2024.  In absence of such designation by the Bureau of Prisons, the defendant shall

report on or before the same date and time to the U.S. Marshals Office located in this building.

The current terms and conditions of the defendant's release shall remain in effect until defendant begins serving his sentence.  At that point in time, any bond that he has posted will be exonerated.

Do you want me to make a recommendation in terms of location?

MS. AXEL:  Yes, Your Honor.  Minimum security in Southern California.  I'm not clear if it's still minimum in Lompoc.  I don't know if the Court knows.

THE COURT:  All right.  I will make that recommendation.

Anything else from the Government?

MS. CAAMANO:  Your Honor, just as a matter of housekeeping, would the Court request that defense counsel confirm that she conferred with her client regarding the second amended General Order 20-04 and that he has reviewed it?

THE COURT:  That wasn't attached to the revised PSR?

MS. CAAMANO:  It was not.  It was just referenced from what I -- but the Government, for the record, e-mailed it to defense counsel a few days ago and defense did --

THE COURT:  It's included in the letter of recommendation which she indicated she had reviewed with her

client.

So you reviewed the general order with your client?

MS. AXEL:  Yes, I did, Your Honor.

THE COURT:  Anything else from the Government?

MR. MITCHELL:  No, Your Honor.  Thank you very much.

THE COURT:  Anything else from the defense?

MS. AXEL:  No, Your Honor.  Thank you very much.

THE COURT:  All right.  Thank you very much.  We will be in recess.

(Proceedings concluded at 10:04 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  11TH  DAY OF NOVEMBER, 2025.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER